IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MARIA DIANA CAVILEER,

                Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 18-1341 (JBS)

**OPINION**

APPEARANCES:

Alan H. Polonsky, Esq.
POLONSKY AND POLONSKY
512 S. White Horse Pike
Audubon, NJ 08106
    Attorney for Plaintiff

Rachel E. Licausi
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
300 Spring Garden Street
Philadelphia, PA 19123
    Attorney for Defendant Commissioner of Social Security

**SIMANDLE**, District Judge:

## I.  INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C. § 405(g) for review of the final decision of Defendant Commissioner of the Social Security Administration (hereinafter "Defendant") denying the application of Plaintiff Maria Diana Cavileer (hereinafter "Plaintiff") for disability benefits under Title II

of the Social Security Act, 42 U.S.C. § 401, et seq. Plaintiff, who suffers from degenerative disc disease, thrombocytosis status post partial amputations of the right index and long fingers, obesity, carpal tunnel syndrome, sleep apnea, asthma, thyroid impairment, and affective disorder was denied benefits for the period beginning on August 25, 2013, the alleged onset date of disability, to October 18, 2016, the date on which Administrative Law Judge Paul R. Armstrong (hereinafter "ALJ Armstrong" or "the ALJ") issued his written decision.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on numerous grounds, including that the ALJ erred by: finding that Plaintiff's sleep apnea and mental problems were not "severe" impairments; improperly determining Plaintiff's "Residual Functional Capacity" ("RFC"); and finding that Plaintiff is able to perform past work activity and alternative work activity. Defendant opposes Plaintiff's appeal. (See Def.'s Opp'n [Docket Item 10].) The Court will remand the ALJ's decision, because the ALJ failed to consider significant, perhaps dispositive, medical conditions, pain, treatments (including surgeries), and opinions of treating physicians during the alleged period of disability.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff filed her application for Social Security disability benefits on April 29, 2014, alleging a disability onset date of August 25, 2013. (Administrative Record (hereinafter "R.") [Docket Item 5], 24.) Plaintiff's claim was denied by the Social Security Administration on September 17, 2014. (Id.) Plaintiff's claim was again denied upon reconsideration on January 7, 2015. (Id.) Plaintiff next testified before ALJ Armstrong by way of a video hearing on August 16, 2016. (Id.) ALJ Armstrong issued his opinion on October 18, 2016, denying Plaintiff benefits. (Id. at 24-34.) On December 20, 2017, the Appeals Council denied Plaintiff's request for review. (Id. at 1-4.) This appeal timely follows.

### B.   Medical History

Plaintiff has been diagnosed with degenerative disc disease, thrombocytosis status post partial amputations of the right index and long fingers, obesity, carpal tunnel syndrome, sleep apnea, asthma, thyroid impairment, and affective disorder. (Id. at 26-28.) Plaintiff has undergone multiple surgeries to amputate portions of two of her fingers. As reported to Dr. Stephen Soloway, M.D., Plaintiff's rheumatologist, these surgeries began at least in 1988, with the amputation of the tip of her right index finger. (Id. at 592.) As a result of poor blood flow (ischemia) and

thrombosis, between August 2013 and December 2013, Plaintiff developed dry gangrene in her right index and middle fingers. (Id. at 403-04, 413-15, 447-50, 473-77.) Plaintiff contends that she was "hospitalized with thrombocytosis and ultimately underwent amputations of the last joint of the right [index] finger and middle finger" in February 2014. (Pl.'s Br. [Docket Item 9], 8.) Plaintiff's brief does not cite to any specific medical records that document the alleged surgery in February 2014, however Defendant does not dispute that such a surgery took place.[1] (Pl.'s Br. [Docket Item 9], 8; Def.'s Opp'n [Docket Item 10], 8.)

Beginning in April 2015, Plaintiff began seeing Dr. Stanley Marczyk, M.D., an orthopedic specialist, who diagnosed Plaintiff with bilateral carpal tunnel, bilateral cubital tunnel, cervical radiculopathy, and clotting disorder. (R. at 1404-05.) At a follow-up appointment in May 2015, Dr. Marczyk discussed the potential risks and benefits of surgery to relieve some of Plaintiff's symptoms. (Id. at 1402-03.) In July of 2015, Dr. Marczyk saw Plaintiff again and Plaintiff complained of increased arm and wrist pain as a result of increased lifting. (Id. at 1398-99.) In August 2015, Dr. Marczyk saw Plaintiff once again and recommended that she continue to wear a wrist brace and receive cervical spinal

---

[1] Additionally, the ALJ's decision notes that Plaintiff has undergone partial finger amputations due to thrombocytosis, but does not cite to any medical records of such a procedure. (R. at 26, 29.)

injections; Dr. Marczyk also discussed the need for surgery in the future, if symptoms worsen. (Id. at 1392-93.) Plaintiff presented again at Dr. Marczyk in January 2016, complaining of tingling and numbness in her hands; Dr. Marczyk provided Plaintiff with an injection, which seemed to alleviate her symptoms, ordered a new EMG nerve test, and discussed with Plaintiff the potential future need for surgery. (Id. at 1386-87.) The EMG nerve study ordered by Dr. Marczyk, and undertaken by Dr. Wei Xu, M.D., later indicated bilateral carpal tunnel syndrome. (Id. at 1429-32.) In April 2016, Plaintiff again saw Dr. Marczyk, where Plaintiff indicated that she was interested in proceeding with surgical interventions to relieve the symptoms of her carpal tunnel syndrome; Dr. Marczyk informed Plaintiff that the surgeries may not completely relieve Plaintiff's symptoms. (Id. at 1382-83.) On May 10 and June 21, 2016, Dr. Marczyk operated on Plaintiff in order to address her carpal tunnel syndrome in her right and left hands, respectively. (Id. at 1372, 1376; Pl.'s Br. [Docket Item 9], 8; Def.'s Opp'n [Docket Item 10], 16.)

On June 24, 2016, following Plaintiff's two carpal tunnel surgeries, Plaintiff's primary care provider, Dr. Rafat Choudhry, M.D., noted that Plaintiff denied experiencing any joint pain, swelling, or weakness. (R. at 1246-49.) Nevertheless, Plaintiff testified at the August 16, 2016 hearing, less than two months after her second carpal tunnel surgery, that she was experiencing

continued pain in her hands and stiffness in her finger joints as a result of carpal tunnel syndrome and that she is seeking additional treatment from her physicians for such pain and stiffness. (Id. at 58.)

Meanwhile, Plaintiff received treatments for significant neck and back pain throughout the period of alleged disability. During Plaintiff's neurological consultation with Dr. Maria Carta, M.D., on April 22, 2014, Plaintiff complained of lower back pain, which radiates to "both buttocks and posterior dermatomes" and is exacerbated by sitting or standing, which began approximately 20 years earlier. (Id. at 711.) During this visit, Dr. Carta diagnosed Plaintiff with cervical disc displacement with myelopathy as well as cervical root lesions. (Id. at 714.)

On orders of Plaintiff's neurologist, Dr. Keith V. Preis, M.D., Plaintiff underwent MRIs of her cervical and lumbar spinal regions on October 10, 2014. (Id. at 889-92.) Those MRIs revealed that Plaintiff suffers from "multilevel disc bulging/herniation . . . with associated nerve root compromise" in both regions, as well as a possible "right paracentral disc herniation with annular tear at the T12-L1 level." (Id.) Further EMG studies undertaken by Dr. Preis on November 5 and 19, 2014 showed that Plaintiff exhibits "a right L5-S1 radiculitis, as well as a proximal nerve legion on the left side at the L5, S1 levels" and "a left C5, [C]6 radiculitis," (Id. at 901, 922.) At a follow-

up appointment on January 27, 2015, with her pain specialist, Dr. Abdul Qadir, M.D., Plaintiff reported that the majority of the pain she experienced was "located in the low back and neck," though Plaintiff also indicated that the reported pain was "being controlled adequately" with medication. (Id. at 1018.) At another follow-up appointment with Dr. Qadir on February 24, 2015, Plaintiff reported pain "located in the buttocks, left shoulder, left thigh, neck and right thigh," though Plaintiff again indicated that the reported pain was "being controlled adequately" with medication. (Id. at 1014.) During a neurosurgical consultation on March 25, 2015 with Dr. Andrew Glass, M.D., the physician's examination of Plaintiff revealed that she exhibited "[c]ervialgia with bilateral radiculopathy, herniated nucleus pulposus C4-5, bulging disc annuli C2-3, C3-4, C5-6, C6-7, C7-T1, thoracic back pain, low back pain with bilateral lombar radiculopathy, herniated nucleus pulposus with annular tear T12-L1, bulging disc annulus L1-2, L2-3, herniation L3-4, herniation with annular tear L4-5 and L5-S1." (Id. at 1037.) In that appointment, Dr. Glass indicated that Plaintiff wished to pursue non-surgical treatment for her spinal conditions, though Dr. Glass counseled Plaintiff that surgical interventions may be necessary in the future to care for her cervical and/or lumbar spine. (Id. at 1036.) On April 1, 2015, Plaintiff returned for a follow-up evaluation with Dr. Preis, indicating that Plaintiff had received "lumbar facet injections"

from Dr. Qadir, but that those injections only resulted in pain relief for "about two to three days and then the pain returned." (Id. at 1116.) Dr. Preis also indicated that Plaintiff

> still has neck and low back pain that is worse with any activity and causing more spasms. Prolonged standing or walking causes increased pain as well. [Plaintiff] has not been doing as much. She has to constantly change positions due to pain in the hip area and pain in the arms. [Plaintiff] has more pain in the right hip recently[,] but she has more pain and numbness down the left upper and lower extremities, more with any activity.

(Id.) As a result, Dr. Preis recommended that Plaintiff continue her pain management regimen and consult a neurosurgeon. (Id. at 1119.) During a subsequent follow-up appointment with Dr. Glass, on April 23, 2015, the physician's examination of Plaintiff's spine revealed "moderate restriction of range of motion" in the cervical spine as well as multiple regions of "point tenderness" in the cervical and thoracic spine. (Id. at 1171.) Physical exams undertaken by Dr. Choudhry in October, November, and December of 2015 and January though June of 2016 indicated that Plaintiff had a normal range of motion in all areas and no indications of tenderness. (Id. at 1248, 1252, 1256, 1260, 1264, 1268, 1272, 1276, 1280, 1284, 1288.) However, a physical exam undertaken on January 20, 2016 by Dr. Xu, prior to the EMG nerve study ordered by Dr. Marczyk, revealed that Plaintiff's "[c]ervical spine range-of-motion is decreased with flexion and extension," and that

"[t]enderness is noticed at the bilateral cervical paraspinal muscles." (Id. at 1429.) Additionally, at follow-up appointments with Dr. Qadir in January, March, April, May, and June of 2016, Dr. Qadir noted that Plaintiff reported chronic pain, lower back pain, mid-back pain, muscle pain, muscle spasms, and neck pain. (Id. at 1227, 1231, 1235, 1239, 1243.)

In addition to treating conditions in her hands, wrists, neck, and lower spine, Plaintiff was treated for significant mental health issues, including depression. On August 15, 2014, Plaintiff met with Dr. Marie Hasson, M.D., seeking a prescription for Cymbalta, in order to treat Plaintiff's depression. (Id. at 966.) Plaintiff reported that she had previously received a prescription for Cymbalta from her primary care physician in order to treat Plaintiff's pain symptoms. (Id.) Plaintiff reported that her depression was being exacerbated by a recent death in the family as well as her pending divorce. (Id.) Plaintiff also reported manic episodes, as well as anxiety. (Id.) Dr. Hasson provided Plaintiff with a renewed prescription for Cymbalta. (Id. at 993.) On August 19, 2014, Plaintiff met with Dr. Victoria Miller, Ph.D., to discuss her mental health status; Plaintiff indicated to Dr. Miller that she has had "psychiatric problems since she was a teenager" and that "since 2010 [Plaintiff] has been treated with Cymbalta for management of dysphoria." (Id. at 874.) Additionally, Plaintiff reported that "she has had anxiety associated with depression."

(Id.) Plaintiff has experienced psychiatric problems since her teens or early-20s and previously engaged in self-injurious behavior. (Id. at 874, 966-67.) Plaintiff also reported that she abused alcohol from ages 9-21, but that she has refrained from alcohol since age 21. (Id. at 875.) Ultimately, Dr. Miller diagnosed Plaintiff with "[m]ajor depressive disorder with anxious distress" and "[a]lcohol use disorder, in sustained remission." (Id. at 876.) During follow-up appointments in September and October 2014 with Dr. Hasson, both Plaintiff and Dr. Hasson believed that Plaintiff's symptoms had lessened somewhat. (Id. at 1000, 1007-08.) During a follow-up appointment in February 2015 with Dr. Hasson, both Plaintiff and Dr. Hasson again believed that Plaintiff's symptoms had continued to lessen. (Id. at 1107.) However, in her March 2015 follow-up, both Plaintiff and Dr. Hasson believed that Plaintiff's symptoms had worsened, and it appears that Dr. Hasson prescribed Seroquel on a trial basis. (Id. at 1099-1103.) After that point, at follow-up appointments in May, June, August, and November 2015, and in January 2016, both Plaintiff and Dr. Hasson again believed that Plaintiff's condition had continued to improve. (Id. at 1072, 1079, 1087, 1092, 1097.) However, in April 2016, Plaintiff reported that she was feeling more depressed, more anxious, and more irritable, with difficulty falling asleep and increased sensitivity to sound. (Id. at 1059.) As a result, both Plaintiff and Dr. Hasson believed that Plaintiff's symptoms

had once again worsened, and therefore Dr. Hasson complied with Plaintiff's request for an increase in her dose of Seroquel. (Id. at 1059-66.) In May of 2016, Plaintiff presented to Dr. Hasson as still anxious, and both Plaintiff and Dr. Hasson believed that Plaintiff's condition had been unchanged since her April appointment. (Id. at 1051-58.)

### C. ALJ Decision

In a written decision dated October 18, 2016, ALJ Armstrong determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time from August 25, 2013, the alleged disability onset date, through October 18, 2016, the date of the ALJ's decision. (Id. at 24-34.)

Using the five-step sequential evaluation process, the ALJ determined at step one that Plaintiff had not engaged in any substantial gainful activity since August 25, 2013, the alleged onset date of disability. (Id. at 26.)

At step two, the ALJ found that Plaintiff had severe impairments due to degenerative disc disease, thrombocytosis status post partial amputations of right index and long fingers, obesity, and carpal tunnel syndrome. (Id. at 26-28.) Notably, the ALJ determined that Plaintiff's sleep apnea, asthma, thyroid impairment, and affective disorder were not severe. (Id.)

Next, at step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, meet the severity of one of

the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Id. at 28.) Specifically, in considering whether Plaintiff's impairments reached the severity level of a listed Major Joint Dysfunction, Listing 1.02, the ALJ noted that "there is no evidence that [Plaintiff] is unable to ambulate effectively." (Id.) The ALJ further found that Plaintiff's spine disorders were not severe enough to meet the requirements of Listing 1.04. (Id. at 28-29.) In considering the severity of Plaintiff's finger amputations, the ALJ determined that they were not severe enough to meet the requirements of Listing 1.05 (Id. at 29.) The ALJ additionally found that Plaintiff's "venous thrombosis and clotting disease [do] not meet [L]isting 7.08 for coagulation defects." (Id.) With regards to Plaintiff's neuropathy, the ALJ found that it does not meet or medically equal the criteria of Listing 11.14. (Id.) With respect to Plaintiff's obesity, the ALJ found that "[t]here is no evidence in the record . . . that [Plaintiff's] obese physique aggravates the other impairments so much as to result in listing-level severity. (Id.)

Between steps three and four, the ALJ needed to determine Plaintiff's RFC. The ALJ found that Plaintiff had the RFC to perform "light work . . . where [Plaintiff] lifts or carries 20 pounds occasionally and 10 pounds frequently, stands or walks for six of eight hours during the workday, and sits for six of eight hours during the workday," except "no forceful gripping with

[Plaintiff's] right (dominant) hand." (Id.) In determining Plaintiff's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id. at 30.) The ALJ largely discounted the medical opinion of Plaintiff's treating physician, Dr. Maria Carta, M.D., finding her opinion to be "very vague and [that it] does not specify how [Plaintiff's] obesity limits her ability to work." (Id. at 31.) The ALJ granted "little weight" to the opinions of Dr. Abdul Qadir, M.D., Nancy To, APN, "an unknown representative from Regional Internal Medical Associates, and an unknown representative from the State of New Jersey Division of Family Development" that Plaintiff "is disabled, unable to work, or incapable of a level of sedentary work," because, according to the ALJ, these opinions are "contradicted by tests that showed normal walking and full strength" and "by [Plaintiff's] apparent normal physical functioning during the hearing." (Id. at 31–32.) Finally, the ALJ stated that his RFC assessment was "supported by evidence of the claimant recovering well from amputation surgery, and otherwise functioning in a stable manner in terms of her motor functioning." (Id. at 32.)

Based on Plaintiff's RFC and testimony from a vocational expert, the ALJ found, at step four, that Plaintiff was "capable of performing past relevant work as a sales representative." (Id.)

Finally, in the alternative, at step five, the ALJ found that "there are other jobs existing in the national economy that [Plaintiff] is also able to perform," including those of children's attendant (35,000 jobs nationally), usher (33,300 jobs nationally), and furniture rental clerk (157,000 jobs nationally). (Id. at 32-33.) Accordingly, the ALJ found that Plaintiff was not disabled. (Id. at 34.)

**III. STANDARD OF REVIEW**

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions

for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Where the ALJ's decision appears to have overlooked significant medical evidence that may be probative of a finding of disability, the reviewing court may remand for consideration.[2] Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121–22 (3d Cir. 2000) (citing Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994); Cotter v. Harris, 642 F.2d 700, 705-07 (3d Cir. 1981)).

**IV. DISCUSSION**

Plaintiff is pursuing three theories in support of her request to overturn the ALJ's decision. The Court addresses each of them in turn.

> **A.    Alleged Lack of Substantial Evidence to Support ALJ's Finding that Plaintiff's Sleep Apnea and Mental Problems were not "Severe" Impairments at Step Two**

Plaintiff alleges that the ALJ's finding that Plaintiff's sleep apnea and mental problems are not "severe" impairments is

---

[2] The administrative record in this case is enormous, consisting of 1,679 pages. [Docket Item 5.] I cannot remember reviewing a longer one in many years. It is probably not possible to capture all relevant entries in the "Medical History" summary appearing in Part II. B, supra. By the same token, the Court acknowledges that the ALJ, confronting such an elaborate record, faced the formidable task, aided by the parties, of locating, synthesizing, and considering the most pertinent parts of the record and then issuing a determination that met the decisional requirements. Indeed, the ALJ is not required to acknowledge and analyze every aspect of the record in the final decision. But if pertinent evidence, material to deciding the disability claim, is not mentioned in the ALJ's determination, as in the present case, then the law of judicial review requires remand for further consideration and explanation of the material omitted evidence.

not supported by substantial evidence. (Pl.'s Br. [Docket Item 9], 21-24.) Specifically, Plaintiff asserts that the ALJ inappropriately relied upon a pulmonary function test to determine that Plaintiff's sleep apnea was not severe. (Id. at 22; Pl.'s Reply [Docket Item 11], 6-7.) However, the record also includes documentation from Plaintiff's pulmonary doctor, Dr. Salm, indicating that Plaintiff's sleep apnea has been treated with a "CPAP" machine and a nasal pillow system, and that Plaintiff's symptoms were effectively managed with these two interventions. (R. at 1182-97; Def.'s Opp'n [Docket Item 10], 3-4.) Therefore, the Court finds the ALJ's finding that Plaintiff's sleep apnea is not severe is supported by substantial evidence on the record.

With regard to Plaintiff's mental impairments, the ALJ found that Plaintiff's "medically determinable medical impairments cause no more than 'mild' limitation" in the functional areas of (1) daily living, (2) social functioning, and (3) concentration, persistence, or pace, and that Plaintiff's impairments have caused zero episodes of extended decompensation. (R. at 27.) Plaintiff asserts that the ALJ made his determinations based on "factors that [were] either irrelevant or contrary to the evidence of record." (Pl.'s Br. [Docket Item 9], 23-24.) With respect to the functional area of "daily living," Plaintiff argues that the ALJ ignored evidence that Plaintiff "depends on her children for assistance." (Id. at 23.) However, even Plaintiff's brief admits

that this assistance was required "because [Plaintiff] is physically unable to manage for herself" and that her need for assistance was "more due to physical problems," rather than due to Plaintiff's mental impairments. (Id. (emphasis added).) Additionally, substantial documentation in the record, including Plaintiff's own statements, supports the conclusion that Plaintiff may have physical impairments that hinder her "daily living," but that her mental impairments cause no more than a "mild" limitation. (See R. at 875-76.) With regards to "social functioning," Plaintiff challenges the ALJ's determination as "contrary to" certain testimony and statements on the record. (Pl.'s Br. [Docket Item 9], 23.) However, the ALJ's determination is consistent with certain evidence on the record showing that Plaintiff has regular social interactions with her children, her mother, and certain close friends. (R. at 27 (citing R. at 875-76).) With regard to "concentration, persistence, and pace," Plaintiff appears to admit in her brief that Plaintiff "perform[ed] adequately on routine testing of rudimentary calculations and memory for repeating at least some objects." (Pl.'s Br. [Docket Item 9], 23.) Plaintiff's brief does not make clear why Plaintiff takes issue with the ALJ's determination relative to Plaintiff's "concentration, persistence, and pace." (See Pl.'s Br. [Docket Item 9], 23-24 ("Lastly, the Administrative Law Judge says there are no problems in regards to concentration, persistence, and pace based on Dr. Miller's

findings which showed only the ability to perform adequately on routine testing of rudimentary calculations and memory for repeating at least some objects, and based on her having a college degree. Again, these explanations are not consistent with even the evidence cited by the Administrative Law Judge. We submit that the basis for these conclusions").)[3]

The Court finds that there is substantial evidence on the record to support the ALJ's finding relative to Plaintiff's mental impairments.

**B.    Alleged Lack of Substantial Evidence to Support ALJ's Finding as to Plaintiff's RFC**

Plaintiff further alleges that the ALJ's findings regarding Plaintiff's RFC were not supported by substantial evidence. (Pl.'s Br. [Docket Item 9], 25-29.) In particular, Plaintiff asserts that the ALJ's RFC does not take proper consideration of her hand condition, which includes amputations of parts of two fingers and continuing difficulties with carpal tunnel syndrome. (Id.) Defendant's response to this allegation includes a summary of Plaintiff's medical records with respect to her hand conditions. (Def.'s Opp'n [Docket Item 10], 7-16.) The ALJ's opinion states that he reached his decision as to the Plaintiff's RFC in part because "the record shows full strength [and] normal sensations." (R. at 31.) However, Defendant's own brief draws the Court's

---

[3] The quotation is accurate and ends in Pl.'s Br. at 24, as shown.

attention to treating physicians whose opinions regarding the severity and duration of Plaintiff's ailments were not addressed by the ALJ. (<u>See</u> Def.'s Opp'n [Docket Item 10], 7-16.) Specifically, Defendant's brief cites at length to the treatment notes of Dr. Preis and Dr. Marczyk, whose treatment of Plaintiff was more fully detailed, <u>supra</u>. (<u>Id.</u> at 10-12 (citing R. at 902-05, 941-43, 1114-45), 13-16 (citing R. at 1381-1426).) This includes quoting Dr. Preis' notes, that he believed "that Plaintiff's 'injuries are permanent and will not heal completely to normal even with continued care and treatment.'" (<u>Id.</u> at 12 (quoting R. at 1142).) Defendant's brief additionally cites to a document in which Dr. Marczyk cautioned that Plaintiff's carpal tunnel syndrome surgeries, which were done shortly before the ALJ hearing, may not relieve all of her carpal tunnel syndrome symptoms. (<u>Id.</u> at 15 (citing R. at 1382).) While the ALJ's opinion notes one statement made by Plaintiff to Dr. Preis as well as a brief mention of the carpal tunnel surgeries undertaken by Dr. Marczyk, it appears that the ALJ took neither Dr. Preis' nor Dr. Marczyk's medical opinions into account, nor did the ALJ assign either Dr. Preis' or Dr. Marczyk's opinions a weight in determining Plaintiff's RFC. In addition, Defendant's brief cites at length to the records of Plaintiff's primary care physician, Dr. Choudhry, in order to support the ALJ's determination that Plaintiff is not disabled, (<u>id.</u> at 8-9, 11, 14-18), however, the ALJ's decision

does not appear to make a single reference to any of Dr. Choudhry's notes or opinions, much less assign a weight to those opinions. (R. at 24-34.) We cannot tell from the ALJ's decision whether he actually considered the significant hand impairments, pain, and permanent limitations reflected in Dr. Preis' and Dr. Marczyk's treatment records, or whether he considered the significant volume of records provided by Dr. Choudhry. This omission is material because Plaintiff's significant hand impairments and pain lasted for almost the entire time of the period of alleged disability, even if one assumes that the carpal tunnel surgery alleviated them somewhat two months before the ALJ hearing. Additionally, the omission of consideration of Dr. Preis' opinions is material because they related to Plaintiff's spinal conditions, including her degenerative disc disease, which the ALJ found to be severe, and which Plaintiff appears to have been suffering from for the majority of the alleged disability period.

Additionally, the ALJ states that "during the hearing [Plaintiff] did not present with significant handling or other physical limitations." (Id. at 31.) Plaintiff is highly critical of the ALJ's observation of her ability to "handle" anything at the hearing and certainly she has had no opportunity to rebut what the ALJ believed he was witnessing. Further, the ALJ's decision does not appear to take into consideration that Plaintiff underwent multiple surgeries over the course of the alleged period of

disability, (see Def.'s Opp'n [Docket Item 10], 16)), and that it is possible that Plaintiff's condition was more severe at certain points in that period prior to the hearing date. It is possible, due to the significant surgeries that Plaintiff undertook during her period of alleged disability, that there were portions of time during that period where she was disabled and other periods where she was not. However, the ALJ does not take account of this possibility, or describe why his determination is equally valid both before and after Plaintiff's surgeries.

Therefore, the Court finds that the ALJ's RFC determination did not give sufficient consideration to the records from Plaintiff's treating physicians, nor does it sufficiently account for the well-documented changes in Plaintiff's condition over the course of the alleged period of disability: August 25, 2013 to October 18, 2016. Accordingly, the ALJ's decision shall be remanded for further consideration.

**C. Alleged Lack of Substantial Evidence or Adequate Rationale to Support ALJ's Findings as to Plaintiff's Ability to Perform Either Past Work Activity at Step Four or Alternative Work Activity at Step Five**

Plaintiff finally alleges that the ALJ's determinations at steps four and five were inappropriate due to the RFC having been improperly calculated. (Pl.'s Br. [Docket Item 9], 29-30.) As the Court will remand this case for determination of a new RFC, the Court need not address this argument at this time.

## V.   CONCLUSION

For these reasons set forth above, the Court finds that the case should be remanded to ensure that the ALJ properly weighs the medical opinions of Plaintiff's treating physicians, as appropriate, in determining Plaintiff's RFC throughout the period of alleged disability, including the possibility that Plaintiff was disabled for the earlier portion of this period and not disabled following surgeries and other medical interventions as discussed above. An accompanying Order will be entered.


**February 1, 2019**                              **s/ Jerome B. Simandle**
Date                                              JEROME B. SIMANDLE
                                                  U.S. District Judge